```
              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION
```

UNITED STATES OF AMERICA                                      PLAINTIFF

    v.        CASE NO. 08-50090

DAVID EUGENE NICKLAS                                          DEFENDANT

### REPORT AND RECOMMENDATION

    On October 6, 2009, the psychiatric report filed on October 1, 2009, was referred to the undersigned for consideration of the examiner's recommendation that the defendant be subjected to involuntary administration of antipsychotic medication in an attempt to restore his competency to stand trial. The Court conducted a hearing on the issue on October 22, 2009, and, being well and sufficiently advised, finds and recommends as follows with respect thereto:

    1.  A one-count indictment was filed on November 19, 2008, charging the defendant with sending a facsimile communication to the Department of Justice, Inspector General, which contained a threat to injure agents of the Federal Bureau of Investigation, in violation of 18 U.S.C. § 875(c).

    2.  Upon motion of the Government, the Court ordered a psychological examination of the defendant to determine his competency to stand trial and whether he was sane at the time of the offense.  In a report dated February 13, 2009, Dr. Robert Johnson diagnosed defendant with schizophrenia, paranoid type. (2/13/09 Report at pg. 7.)

Dr. Johnson opined that the defendant was competent to proceed to trial, as he understood the nature of the proceedings against him and had the ability to adequately work with defense counsel. (Id. at pg. 8.) As to defendant's mental state at the time of the offense, Dr. Johnson opined that he suffered "from a severe mental disease or defect to the extent he could not appreciate the nature, quality or wrongfulness of his alleged behavior." (Id. at pg. 9.)

3. Defendant subsequently indicated in a motion filed with the Court that he had requested his attorney to withdraw from the case. At a hearing on the issue, the defendant stated that he believed, based on his "psychic powers," that the mob had paid his counsel $10,000 to "throw the case." Defendant explained that, with his psychic abilities, he has fought organized crime by finding drug labs, drug shipments, etc., and that "organized crime is wanting to see [him] behind bars so [he] can't hurt them anymore." (4/28/09 Tr. at 4-5.)

The Court found no basis for relieving defense counsel, but found reasonable cause to question whether defendant remained competent to proceed to trial. The Court, therefore, ordered a supplemental competency evaluation. In a report dated June 19, 2009, Dr. Johnson opined that the defendant was not competent to proceed to trial, noting that defendant had included his attorney in his delusions and believed the mob had "paid off" his attorney.

Dr. Johnson recommended that the defendant be sent to a Federal Medical Center "for treatment of his psychotic disorder and for an attempt at competency restoration." (6/12/09 Report at pgs. 3-4.)

4. At the defendant's request, the Court conducted a hearing, pursuant to 18 U.S.C. § 4241(c) and 4247(d), on the issue of defendant's competency to proceed to trial. At the hearing, Dr. Johnson testified that during defendant's supplemental evaluation, defendant discussed his psychic powers and his belief that his counsel had been paid off by the mob. Dr. Johnson explained that, given this belief, he did not believe the defendant could work with his counsel and he, therefore, found defendant incompetent to proceed to trial.

Based on Dr. Johnson's supplemental evaluation and testimony at the competency hearing, the Court found that the defendant was not competent to proceed to trial. The Court committed the defendant to the Federal Medical Center in Butner, North Carolina, for treatment and to determine whether there was a substantial probability that in the foreseeable future the defendant would attain the capacity to permit the proceedings to go forward.

5. In a report dated September 29, 2009, Staff Psychiatrist Ralph Newman concurred with Dr. Johnson's diagnosis of schizophrenia, paranoid type. Dr. Newman recommended treatment with antipsychotic medication. Defendant requested a hearing on this issue, which was conducted by the undersigned on October 22,

2009. Government counsel was present at the hearing, and defendant, his attorney, and Dr. Newman appeared by video-conference from the Butner facility.

6. Prior to considering whether the defendant should be forcibly medicated to restore his competency to proceed to trial, the Court must determine "if forced medication is warranted for a different purpose, such as the purposes set out in <u>Harper</u> related to the individual's dangerousness, or purposes related to the individual's own interest where refusal to take drugs puts his health gravely at risk." See <u>Sell v. United States</u>, 539 U.S. 166, 181-82 (2003) (referencing <u>Washington v. Harper</u>, 494 U.S. 210 (1990)). In his report and at the hearing, Dr. Newman opined that the purposes set out in <u>Harper</u> did not apply, as the defendant – in the confines of the medical center – had not exhibited symptoms rendering him an imminent danger to himself, others, or the property of another, nor was there any indication that his health was gravely at risk. (9/19/09 Report at pg. 11.) Thus, the Government does not seek to forcibly medicate defendant for these purposes, but for the purpose of restoring his competency to proceed to trial.

7. In certain circumstances, the Constitution permits the Government to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in an effort to render him competent to stand trial. Those

circumstances, however should be rare and the required standard is fairly stringent. See Sell, 539 U.S. at 180. A defendant may not be forcibly medicated to restore competency unless the Government demonstrates that:

* important government interests are at stake;
* involuntary medication is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial;
* involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and
* the administration of the drugs is medically appropriate.

See id. at 180-82. While the Eighth Circuit Court of Appeals has not addressed the issue, several other circuit courts of appeals have determined that the Government must prove its case under Sell by clear and convincing evidence. See, e.g. Thompson v. Bell, 580 F.3d 423, 447 (6th Cir. 2009); United States v. Grape, 549 F.3d 591, 598-99 (3rd Cir. 2008); United States v. Valenzuela-Puentes, 479 F.3d 1220, 1229 (10th Cir. 2007); United States v. Gomes, 387 F.3d 157, 159 (2nd Cir. 2004), cert. denied, 543 U.S. 1128 (2005). Given the importance of the constitutional interests at issue, the

undersigned agrees with the holdings from our sister circuits that the Government must present clear and convincing evidence to satisfy the Sell factors.

### **First Factor**

8.   With regard to the first factor, in Sell, the Court stated that there is an important governmental interest in bringing to trial a defendant accused of a serious crime.  That is so because the criminal law seeks to protect "the basic human need for security."   The importance of the Government's interests, however, may be lessened by special circumstances, and so the facts must be considered in each case.  Sell, 539 U.S. at 180.

The charge of threatening to injure Federal Bureau of Investigation agents is certainly a serious offense.  The analysis, however, does not end there.  In Sell, the Court observed:

> Special circumstances may lessen the importance of [the Government's interest in prosecuting a serious offense]. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill – and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime.  We do not mean to suggest that civil commitment is a substitute for a criminal trial.  The Government has a substantial interest in timely prosecution....  The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed...).

Id. at 180.

If the defendant is not restored to competency, or, even if he is restored to competency but found not guilty by reason of insanity at trial, he may be committed to a medical center until such time as he no longer poses a "substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. §§ 4243(d), 4246(a). At the hearing, the undersigned questioned Dr. Newman about the possibility of whether the defendant posed such a risk if released. Dr. Newman stated that he could not give an opinion on this issue, as an evaluation consisting of various criteria (including defendant's criminal history, social supports, compliance with treatment, etc.) would have to be conducted by a risk assessment panel. When asked whether, hypothetically, a person with defendant's history, charges, and diagnosis, would pose a danger if released, Dr. Newman stated that he would "not commit" on the issue, but that, in his experience, he did not believe such a person would pose a danger.

Based on the foregoing, the undersigned finds that the Government's interest in prosecuting the defendant is not diminished by the possibility of defendant's continued commitment for mental health treatment, as such possibility is uncertain at this point. The Government's interest in prosecuting the defendant is likewise not diminished by the fact that the

defendant has already spent approximately one year in confinement, as the statutory maximum for the defendant's offense is five years and the median Sentencing Guideline range is 33 months.[1]

In sum, the undersigned finds there is clear and convincing evidence that the government's interest in prosecuting the defendant is sufficiently important enough to satisfy the first prong of the Sell test, based on the seriousness of the offense with which defendant is charged; the uncertainty of whether the defendant would be committed for mental health treatment if not restored to competency or if found not guilty by reason of insanity; and the fact that the defendant faces significant prison time.

## Second Factor

9.  A high probability of success is required to establish that involuntarily medicating a defendant is substantially likely to render him competent. See Gomes, 387 F.3d at 161-62 (finding 70% success rate sufficient under Sell), cited in United States v. Ghane, 392 F.3d 317, 320 n. 2 (8th Cir. 2004). In his report and at the hearing, Dr. Newman opined that there was a 70% likelihood

---

[1] As explained at the hearing by the probation officer assigned to defendant's case, defendant's Guideline range could be from 6 to 12 months (best case scenario) to the statutory cap of 60 months (worse case scenario), depending on whether certain enhancements apply, which is arguable at this juncture. Accordingly, the median Guideline range appears to be 33 months.

that antipsychotic medication would reduce the intensity of defendant's symptoms to the extent that he could be restored to competency to stand trial.

In Ghane, the defendant suffered from delusional disorder, which is characterized by "nonbizarre" delusions. The psychiatric testimony in Ghane established that antipsychotic medication was ineffective in treating delusional disorder, with only a 5% to 10% chance of restoring competency. The Eighth Circuit held that this "glimmer of hope" was insufficient to satisfy the second Sell factor. Id. at 319-20.

At the hearing, defense counsel argued that defendant's delusions were not bizarre and, thus, that defendant would not respond to antipsychotic medication any better than someone with delusional disorder would.

> The differential diagnosis between Schizophrenia and Delusional Disorder rests on the nature of the delusions (nonbizarre in Delusional Disorder).
>
> Delusions are deemed bizarre if they are clearly implausible and not understandable and do not derive from ordinary life experiences. An example of a bizarre delusion is a person's belief that a stranger has removed his or her internal organs and has replaced them with someone else's organs without leaving any wounds or scars. An example of a nonbizarre delusion is a person's false belief that he or she is under surveillance by the police. Delusions that express a loss of control over mind or body are generally considered to be bizarre; these include a person's belief that his or her thoughts have been taken away by some outside force..., or that his or her body or actions are being acted on or manipulated by some outside force ("delusions of control").

<u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th edition, Text Revision (2000) at 299, 310.

As reported by Dr. Johnson in his June 12, 2009 report:

> [Defendant] ... reported a belief that the CIA or NSA had put an "Ultra Sonic Emitter" in his neighborhood designed to keep him from effectively using his psychic abilities. He stated "The Ultra Sonic Emitter" effects decision making processes as a psychic. I would look at a picture of a missing girl in Chicago and say she was in Los Angeles. I just wasn't getting it right and I wasn't finding these missing girls.... One day I discovered I had an inner ear infection and wore ear protection. The kind like you wear at the gun range. All of a sudden I was finding people again. The CIA must have put the Ultra Sonic Emitter in my neighborhood to mess me up....

(6/12/09 Report at pg. 2.) Dr. Johnson characterized defendant's delusions as bizarre and diagnosed defendant with schizophrenia, paranoid type. Dr. Newman concurred in this diagnosis and explained that defendant's belief that the CIA or NSA had used an ultra sonic emitter to interfere with his psychic abilities constituted a bizarre delusion of control.

Based on the opinions offered by Dr. Johnson and Dr. Newman, the undersigned finds clear and convincing evidence that defendant suffers from paranoid schizophrenia (with bizarre delusions), as opposed to delusional disorder (with nonbizarre delusions). The undersigned further finds, based on Dr. Newman's assessment of a 70% success rate, there is clear and convincing evidence that antipsychotic medication is substantially likely to render the defendant competent to stand trial.

The Court must next address whether the medication is substantially unlikely to have side effects that would interfere significantly with defendant's ability to assist counsel at trial. Dr. Newman testified that his preferred course of treatment would be an oral medication, such as Abilify, which has few side effects. Dr. Newman explained that if defendant refuses to take the oral medication, then a long-acting injection of Haldol decanoate (with four-week dosing intervals) or Prolixin decanoate (with two-week dosing intervals) would be used. Dr. Newman noted that in many cases, once the Court authorizes forcible medication, patients then decide to comply with oral medication to avoid the injections. The undersigned inquired of defense counsel whether, if forcible medication were ordered, defendant would be willing to take the oral medication. Defendant advised his counsel that he would not.

As to the side effects of the injectable medications Haldol decanoate and Prolixin decanoate, Dr. Newman explained in his report that the most notable side effects are movement disorders, including Parkinsonian effects, dystonic reactions, akathisia, and tardive dyskinesia. All of these side effects, with the exception of tardive dyskinesia, can be minimized by dosage changes and adjunctive medication, and can be completely reversed with discontinuation of the injectable medications. As to the tardive dyskinesia side effect, Dr. Newman explained that the occurrence

rate is only 4% per year, unless the patient is on the medication long-term, in which case, the lifetime prevalence rate is approximately 30%. Dr. Newman explained, "The approach to tardive dyskinesia is prevention, diagnosis and management. Following the initiation of treatment, tardive dyskinesia is monitored at each clinical contact ..."  (9/19/09 Report at pg. 9.)  Dr. Newman opined that the side effects of the injectable medications would be unlikely to interfere with defendant's ability to assist his counsel in his defense.

The undersigned finds clear and convincing evidence that defendant is substantially unlikely to have unmanageable side effects that would interfere with his ability to assist in his defense. Cf. United States v. Palmer, 507 F.3d 300, 304 (5th Cir. 2007), cert. denied, 129 S.Ct. 1128 (2008) (side effects of forcible administration of Haldol, while unpleasant, could be minimized or treated and would not substantially undermine defendant's ability to assist in his defense); United States v. Payne, 539 F.3d 505, 509-10 (6th Cir. 2008) (affirming district court's decision to credit expert testimony that administration of antipsychotic drugs, including Haldol, would be substantially likely to restore competency without unmanageable side effects); United Stats v. White, 2009 WL 3296096, *5-6 (E.D. N.C. Oct. 9, 2009) (Government met second Sell prong, where psychiatrist testified that forcible medication with Haldol and Prolixin

injections would be substantially likely to render defendant competent to stand trial and side effects would be rare and treatable and would not interfere significantly with defendant's ability to assist counsel). Accordingly, the Government has met its burden of proof with regard to the second prong of the Sell test.

### Third Factor

10.  To meet the third prong under Sell, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Sell, 439 U.S. at 181. Dr. Newman observed that defendant has no insight into his mental illness, and is unable to participate meaningfully in counseling or other non-medication treatments. Further, defendant's psychotic symptoms have not remitted spontaneously or with non-medical interventions, and they are unlikely to improve in the foreseeable future without antipsychotic medication. Based on Dr. Newman's assessment, the undersigned finds that no alternative, less intrusive treatment options are available.

### Fourth Factor

11.  To satisfy the fourth Sell factor, the administration of the recommended drugs must be medically appropriate. According to Dr. Newman, the primary acute treatment for schizophrenia involves antipsychotic medication, which can reduce delusional ideation and would likely reduce the intensity of defendant's symptoms such

that he could be restored to competency to stand trial. The undersigned, therefore, finds that the administration of the recommended drugs is medically appropriate.

### Conclusion

12. For the reasons stated above, the undersigned recommends that the request to forcibly medicate the defendant be **GRANTED**, subject to the following conditions:

* The medical center staff shall provide defendant with a copy of this order;
* The medical staff shall medicate defendant in a manner consistent with the medication plan outlined in Dr. Newman's report;
* All medical staff shall first request that defendant voluntarily take medication before each forced administration of medication; and
* If defendant declines to voluntarily take medication within ten days of this order for the first administration and within medically reasonable times to achieve the goal of the medical plans for all subsequent administration, the medical staff is authorized to administer the medication by injection.

13. The undersigned further recommends:

* that defendant's commitment to the medical center be continued pursuant to 4241(d) for a period of up to four months;

* that at the end of this four-month period, or whenever defendant's competency is restored, if sooner, the medical center shall file a report with the Court detailing the results of treatment, whether defendant's competency has been restored, and what side effects from the medication, if any, might affect defendant's ability to assist in his defense;

* that should defendant desire a hearing regarding the results of the report, he will have ten days from the filing of the report within which to demand one; and

* that the delay occasioned by the competency proceedings and hospitalization and treatment of the defendant be excluded under the provisions of 18 U.S.C. § 3161(h)(1)(A) and h(4).

14. Finally, an order permitting the forcible medication of a defendant is immediately appealable. See Sell, 539 U.S. at 177. Accordingly, should this report and recommendation be adopted and an order entered authorizing the forcible medication of defendant, the undersigned recommends that the order be stayed, upon the

filing of a notice of appeal by defendant, until resolution of the appeal.

15.  **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court**.

DATED this 27th day of October, 2009.

/S/*Erin L. Setser*
ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-16-